IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM E. HUGHES III, et al., : | |
| Plaintiffs, : | CIVIL ACTION |
| : | |
| v. : | |
| : | |
| GEORGE P. BROWN INVESTMENT : | |
| ADVISORS, INC., et al., : | No. 03-4668 |
| Defendants. : | |

**MEMORANDUM**

Schiller, J.                                                                   November 24, 2010

     In this diversity action, Plaintiffs William E. Hughes III and Patricia E. Hughes, husband and wife (collectively, "the Hugheses"), allege that their former investment advisor, George P. Brown Investment Advisors, and its employee, George P. Brown, provided deficient financial advice that ultimately resulted in them losing approximately $1 million. Through an "Asset Protection Trust" arrangement facilitated by Defendants, Plaintiffs' $1 million investment ended up in the Evergreen Fund, which declared bankruptcy in Florida in 2001. Currently before the Court is Defendants' motion for summary judgment, which was renewed following a six-year period during which this matter was placed in suspense. The motion is granted for the reasons that follow.

**I. BACKGROUND**

     William E. Hughes III is a retired general contractor who lives in New Jersey. (Defs.' Mot. for Summ. J. Ex. I [William Hughes Dep. 237-39].) Patricia Hugues is a former nurse and

1

real estate agent. (*Id.* Ex. J [Patricia Hughes Dep. 68-69].) George P. Brown Investment Advisors, Inc. ("BIA") is a Pennsylvania corporation founded in 1985. (*Id.* Ex. G [George Brown Dep. at 6, 17].) George P. Brown is the founder and part-owner of BIA. (*Id.* at 18.) BIA provides asset planning and investment advisory services. (*Id.* at 23-24.)

On March 28, 1997, George Brown met with the Hugheses to discuss devising an estate plan for them. (Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. A [Letter from George Brown to the Hugheses dated Apr. 1, 1997].) The estate plan included an "Asset Protection Trust" that was designed to protect the Hugheses' liquid assets. (*Id.*) At this meeting, George Brown provided information that Surety Bank and Trust ("Surety"), an entity located in the Bahamas, would serve as trustee for the asset protection trust. (*Id.*) George Brown also provided information about another offshore entity, the "Honor Fund," as a possible investment, which Brown represented as a "U.S. Government Mortgage-backed securities portfolio." *Id.* The Hugheses moved forward with the plan and proceeded to establish the asset protection trust with Surety. (William Hughes Dep. 71, 183; George Brown Dep. 74.) William Hughes settled the asset protection trust on or about May 30, 1997 by wiring the sum of $1,000,800 to Surety. (Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. N [fax from Surety to William Hughes dated June 3, 1997].) Of that sum, $1 million—the entirety of the Hugheses' trust investment—was invested in Honor Fund at the Hugheses' direction. (*Id.* Ex. 13 [certificate of units purchased issued by Honor, F.A.].) Defendants received referral fees from Surety for directing the Hugheses to the Honor Fund. (George Brown Dep. 37-38.) The Honor Fund was the only investment option offered for the asset protection trust. (*Id.* at 41-42.) The Hugheses received regular interest payments from Surety from 1997 to September 2000 based on Surety's investment in the Honor Fund. (Defs.'

2

Mot. for Summ. J. Ex. T [Client Statement from Surety].)

In October of 2000, the Hugheses received a check for the first time from an "Evergreen Fund" instead of their usual payor, Surety. (Pls.' Opp'n to Defs.' Mot. for Summ. J. 10.) After asking a BIA employee about this, the Hugheses were told that Surety was going out of business, and that a new trustee would have to be appointed for the asset protection trust. (*Id.*) The Hugheses therefore executed documents appointing a new trustee, the Grenadines Trust and Management Company. (*Id.*) In December of 2000, George Brown informed the Hugheses that the Honor Fund was merging with the Evergreen Fund, and that this meant that their investment would thereafter generate a variable return rather than a stable return. (George Brown Dep. 65-66; 78; 115-16; 155-156.) George Brown informed the Hugheses that the Evergreen Fund was allowing its investors an ability to "cash out" without incurring an early withdrawl penalty if investors were not interested in continuing with the Evergreen Fund. (*Id.* at 61, 114.) With the assistance of BIA, the Hugheses attempted to liquidate their investment in the Honor Fund/Evergreen Fund prior to December 31, 2000. The Hugheses never received their money. (Patricia Hughes Dep. 56; William Hughes Dep. 170-72; George Brown Dep. 118.) On January 23, 2001, the Evergreen Fund filed for bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida, allegedly due to fraud perpetrated by its managers. (Defs.' Mot. for Summ. J. Ex. Y [Notice of Evergreen Fund bankruptcy dated Jan. 24, 2001]; Ex. Z [Orlando Sentinel article dated Feb. 24, 2001].) As a result of the bankruptcy, a large portion of the Hugheses' investment has been lost. (Compl. 14)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). A court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    DISCUSSION

The Hugheses articulate four causes of action. Counts I and II of the Complaint charge Defendants with negligent misrepresentation and negligence, alleging that in the course of their recommendations, George Brown and BIA should have known that the assets of the Honor Fund were not invested in U.S. Government mortgage-backed securities, and that the assets of the Honor fund would never be sufficient to pay the Hugheses back their original investment. Counts III and IV allege breach of contract and breach of the covenant of good faith and fair

dealing arising out of the Hughes-BIA investment advice relationship. Defendants argue, inter alia, that both Plaintiffs' tort and contract claims are barred by the applicable statutes of limitations.

> **A.     The Hugheses' Negligent Misrepresentation and Negligence Claims are Time-Barred**

The parties agree that the Hugheses' negligent misrepresentation and negligence claims are subject to a two-year statute of limitations. 42 Pa. Cons. Stat. §§ 5524 (2) & (7). This action was filed in the Montgomery County Court of Common Pleas on June 10, 2003 before being removed to this Court. The Hugheses' tort claims are thus timely only if the causes of action accrued no earlier than June 10, 2001. Defendants contend that the Hugheses were on notice of potential claims against them well before June of 2001. The Hugheses dispute this contention, and also argue that Defendants should be estopped from invoking the statute of limitations.

> *1.     The Discovery Rule Does Not Toll the Statute of Limitations*

Under Pennsylvania law, the statute of limitations "begins to run as soon as the right to institute and maintain suit arises," which is ordinarily when the injury occurs. *Lazarski v. Archdiocese of Phila.,* 926 A.2d 459, 461 (Pa. Super. Ct. 2007); *Drelles v. Mfr. Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. Ct. 2005). Mere "mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute," but the discovery rule may toll the statute if, despite the exercise of reasonable diligence, "the injury or its cause was neither known nor reasonably knowable." *Drelles*, 881 A.2d at 831. Reasonable diligence means "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 7 (Pa. Super. Ct. 2004). The party who invokes the

discovery rule has the burden of proving its applicability by establishing he acted with reasonable diligence in determining the fact and cause of his injury yet was unable to ascertain it. *Weik v. Estate of Brown*, 794 A.2d 907, 909 (Pa. Super. Ct. 2002). The application of the discovery rule is ordinarily a factual issue for a jury. *Id.* However, where "reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause," a court may determine that the discovery rule does not apply as a matter of law. *Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005).

Here, there can be no debate that Plaintiffs knew they had suffered injury well before June of 2001, having been aware of the Evergreen Fund bankruptcy in January of 2001. (William Hughes Dep. 205-06.) Therefore, the only remaining inquiry is when the Hugheses were able, or should have been able "in the exercise of reasonable diligence" to ascertain the factual bases of their claims that their losses were caused by Defendants' allegedly negligent conduct.

With regard to the negligent misrepresentation count, the Hugheses allege that Defendants had reason to know and knew that: (1) "the assets of the Honor Fund, now the Evergreen Fund, were not invested in guaranteed U.S. Government Mortgage-backed Securities Funds" and (2) the assets of the fund "would never be sufficient to pay over to . . . the Hugheses . . . their initial principal investment in the 'Asset Protection Trust' upon maturity of their share in the Honor Fund in 2002, or at any time that withdrawal of funds would have been requested prior to the maturity date." (Compl. ¶¶ 45-46.) The negligence count contains allegations that Defendants failed to exercise reasonable care in giving the Hugheses investment advice. (*Id*. ¶¶ 52-55.)

The Hugheses appear to contend that they only "discovered" they might have claims

6

against Defendants as late as December 2003.[1]  However, the evidence establishes that the Hugheses were fully aware, or, at a minimum, *should* have been aware, that they had potential claims arising from the above allegations against Defendants well before June of 2001.  Mr. Hughes recalled multiple conversations with George Brown wherein Mr. Hughes explained that he would "have to sue" Brown if he did not "get [his] money back." (William Hughes Dep. 199).  Mr. Hughes testified that he had these conversations "from the time [the Hugheses] found out that they [the Evergreen Fund] were bankrupt." *Id.* at 203-04.  This admission belies the Hugheses' contention that they were not aware of a potential cause of action until much later.

Also, the Hugheses learned about the Evergreen bankruptcy in January or February of 2001.  (William Hughes Dep. 205-06.)  This information should have put the Hugheses on notice that the assets they invested may have been substantially lost.  Indeed, from February to May 2001, there were multiple reports in the press indicating that the Evergreen Fund's assets might be lost to investors and that the fund's assets may have been misappropriated. (Defs.' Mot. for Summ. J. Ex. Z [Orlando Sentinel Article dated Feb. 24, 2001]; Ex. CC [Orlando Sentinel article dated May 24, 2001].)  Mr. Hughes received these articles. (William Hughes Dep. 210; Defs.' Mot. for Summ. J. Ex. DD [Letter from Michael Tessitore, Esq. to the Hugheses dated May 30, 2001 enclosing Orlando Sentinel article dated May 24, 2001].)  The record supports the conclusion that a reasonable investigation could have readily uncovered the facts underlying the Hugheses' negligent misrepresentation and negligence claims.

Additionally, the Hugheses were informed by George Brown in December of 2000 that the Honor Fund was going to be combined and/or merged with the Evergreen Fund and that the

---

1. This is inexplicable given that this lawsuit was filed in June of 2003.

Evergreen Fund would yield a variable instead of a stable return. (Pls.' Opp'n to Defs.' Mot. For Summ. J. 10; Brown Dep. 115-16.) At this point, through reasonable diligence, the Hugheses could have taken steps—certainly prior to June of 2001—to inform themselves that their money was no longer invested in U.S. government-backed securities, which had been represented as a key feature of the Honor Fund. (Letter from George Brown to the Hugheses dated April 1, 1997.)

The Court thus concludes that reasonable minds could not differ in finding that the Hugheses "knew or should have known on the exercise of reasonable diligence of [their] injury and its cause," and that they are not entitled to benefit from the discovery rule as a matter of law. *See Weik*, 794 A.2d at 909.

### 2. *The Doctrine of Fraudulent Concealment Does Not Toll the Statute of Limitations*

The Hugheses next argue that Defendants are estopped from asserting the statute of limitations under the doctrine of fraudulent concealment. (Pls.' Opp'n to Defs.' Mot. for Summ. J. 18.) "[I]n order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff[s] justifiably relied." *Kingston Coal Co. v. Felton Min. Co.*, 690 A.2d 284, 291 (Pa. Super. Ct. 1997). The plaintiff bears the burden of proving fraudulent concealment by clear and convincing evidence, and must "show that he exercised reasonable diligence in attempting to uncover the relevant facts." *Forbes v. Eagleson*, 228 F.3d 471, 487 (3d Cir.2000); *Fine*, 870 A.2d at 860. As with the discovery rule, "the fraudulent concealment doctrine does not toll the statute of limitations where the plaintiff knew or should have known of his claim despite the defendant's

misrepresentation or omission." *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006).

Plaintiffs' fraudulent concealment argument fails because there is no evidence that Defendants committed any "affirmative independent act of concealment." *See Kingston Coal*, 609 A.2d at 284.

After the bankruptcy filing, from 2001 to 2003, the Brown Defendants engaged in various activities that the Hugheses contend were intended to induce them to "forebear from instituting suit" against Defendants. (Pls' Opp'n to Defs. Mot. for Summ. J. 21.) For example, BIA arranged and paid for legal counsel to represent the Hugheses' interest in the Evergreen Fund bankruptcy. (Letter from Michael Tessitore, Esq. to the Hugheses dated May 11, 2001.) Additionally, George Brown made arrangements to have both William and Patricia Hughes placed on the payroll of different foundations with which he was involved. (Pls' Opp'n to Defs. Mot. for Summ. J. Ex. 9 [Letter from George Brown to the Hugheses dated Jan. 24, 2002].) BIA also made payments directly to the Hugheses from its operating account. (*Id.* Ex. 11 [copy of check from BIA to William Hughes dated December 2, 2002]; Ex. 12 [fax transmittal with Form 1099 from BIA to William Hughes reflecting payment to William Hughes during 2003].)

While the Hugheses may have hoped that these efforts would help them recover some money from Defendants, thus avoiding a costly lawsuit, none of these activities constitutes "fraud, deception or concealment of facts" sufficient to invoke the fraudulent concealment doctrine. *See Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 278 (Pa. Super. Ct. 2005). Indeed, Plaintiffs fail to identify a single act of concealment committed by Defendants. *See D.D. v. Idant Labs.*, 374 F. App'x 319, 323 (3d Cir. 2010) (holding that fraudulent concealment doctrine did not apply when the plaintiff did "not identify the affirmative

9

independent act of concealment on which she relied," or what it was in the defendant's communications that was fraudulent).

Finally, Defendants' payments and offers to pay the Hugheses are insufficient to invoke the doctrine of fraudulent concealment. *See Belfi Bros. & Co. v. Safeco Ins. Co. of Am.*, Civ. A. No. 94-0844, 1994 WL 591762, at *5 (E.D. Pa. Oct. 28, 1994) ("An openness to amicable settlement, a failure to deny a claim without additional inducement to delay legal action, and an admission of a partial balance without promise of payment do not individually or collectively rise to a level of activity that can be termed fraudulent, deceptive or concealing.").

**B. The Hugheses' Contract and Breach of Duty of Good Faith Claims are Time-Barred**

1. *Breach of Contract*

The Hugheses' contract claims are governed by 42 Pa. Cons. Stat. § 5525(3) (claims on an express contract not in writing). However, in Pennsylvania, an "important limitation on pleading malpractice claims . . . under a contract theory . . . is that a malpractice plaintiff may not sidestep the two-year limitation on tort actions by pleading tort claims as breaches of contract." *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger*, P.C., Civ. A. No. 96-4488, 1997 WL 102521, at *5 (E.D. Pa. Feb. 28, 1997). Moreover, claims "do not fall within the four-year contract limitation period merely because a contract may have existed between the parties, or because a contract between a plaintiff and a professional obliged the professional to exercise reasonable care." *Knopick v. Connelly,* Civ. A. No. 09-1287, 2009 WL 5214975, at *5 (M.D. Pa. Dec. 29, 2009). If this were the case, "the two-year limitation period for professional negligence claims would be a legal nullity." *Id.*

Plaintiffs' claims properly sound in tort, not contract. The Hugheses allege, inter alia, that Defendants failed to "provide competent, reasoned, and researched investment advice, per its agreement with Plaintiff[s]," and that Defendants "fail[ed] to devise an 'Asset Protection Trust' . . . so that their liquid assets would be protected." (Compl. ¶¶ 65-66.) As a result, the Hugheses allege, "Plaintiff[s] have lost . . . One Million Dollars." (*Id.* ¶ 65.) These allegations amount to a classic recitation of the elements of negligence: a duty; a breach of that duty; causation; and damages. *See French v. Commonwealth Assocs.*, 980 A.2d 623, 631 (Pa. Super. Ct. 2009) (applying elements to professional negligence claim). Simply put, the Hugheses contend that they received bad investment advice, that Defendants breached a duty to provide good investment advice, and that they have suffered damages as a result. Accordingly, the Hugheses' claims are governed by a two-year statute of limitations, not a four-year limitations period. *See* 42 Pa. Cons. Stat. §§ 5524(2) & (4). For the reasons discussed above, any negligence claims are time-barred.

2. *Breach of the Covenant of Good Faith and Fair Dealing*

The Hugheses' claim for breach of the covenant of good faith and fair dealing must be dismissed. To the extent Pennsylvania courts recognize an independent cause of action for breach of a good-faith duty, "it arises under the law of contracts, not under the law of torts." *Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F. Supp. 813, 841-42 (E.D. Pa. 1993) (citing *Creeger Brick and Bldg. Supply Inc. v. Mid-State Bank and Trust Co.*, 560 A.2d 151, 153 (Pa. 1989)). A good-faith claim requires a viable breach of contract claim. *See Marci's Fun Food, LLC v. Shearer's Foods, Inc.*, Civ. A. No. 10-188, 2010 WL 3982290, at *8 (W.D. Pa. Oct. 8, 2010). Accordingly, because the Hugheses' contract claim is properly characterized as a

11

professional negligence claim, their claim for breach of the covenant of good faith and fair dealing cannot stand.

IV. **CONCLUSION**

"Under the law of Pennsylvania, it is the duty of the one asserting a cause of action to use all reasonable diligence to inform himself or herself properly of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed statutory period." *Ciccarelli v. Canadian Mines, Ltd.* 757 F.2d 548, 556 (3d Cir. 1985). In light of this duty, the Court concludes that as a matter of law that Plaintiffs failed to file their complaint within the statutory limitations period and that there exists no basis for tolling the statute of limitations. An appropriate Order will be docketed separately.